IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
97 FEB 25 AM 8:13
N.D. OF ALABAMA

TYRE O. KEITH,        )
                      )
    Plaintiff,        )
                      )
v.                    )    CV96-H-1004-E
                      )
FITCO, INC.,          )
                      )
    Defendant.        )

ENTERED
FEB 2 5 1997

## MEMORANDUM OF DECISION

Presently before the Court is the December 23, 1996 motion for summary judgment filed by defendant. Pursuant to the Court's December 27, 1996 Order, the motion was deemed submitted for decision, without oral argument, on January 27, 1997.

### I. Procedural History

Plaintiff Tyre Keith commenced this action by filing a complaint in this Court on April 19, 1996. The complaint alleged that FITCO had discriminated against plaintiff because of his race (black), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff also alleged that FITCO had violated his constitutional right of Equal Protection under the Fifth and Fourteenth Amendments.[1]

---

[1] The Complaint also named William Stease as a defendant, but made no substantive claim against him; the Court dismissed Stease as a defendant on December 12, 1996.



## II. Standards for Evaluating a Summary Judgment Motion

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the jury by means of summary judgment. Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1384 (11th Cir. 1996). However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . .are not rare in employment discrimination cases." Earley v. Champion International Corp., 907 F.2d 1077, 1080. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit encourages district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir. 1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting

2

framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[2] Second, after plaintiff has presented a prima facie case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated

---

[2] In order to present a prima facie case of discrimination, plaintiff must show: (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802. Based on O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

3

against the plaintiff. McDonnell Douglas, 411 U.S. at 804. In other words, "[a]fter a Title VII plaintiff makes out a prima facie case, and the defendant produces a legitimate nondiscriminatory explanation for its actions, the McDonnell-Burdine presumption drops from the case. At that point, the inquiry is whether the defendant intentionally discriminated against the plaintiff." Harris v. Shelby County Board of Education, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

4

explanation is unworthy or credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." Brown, 939 F.2d at 950. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d at 830).

### III. Relevant Undisputed Facts

FITCO is a private company that manufactures edible food ingredients from chicken parts at an Anniston, Alabama plant. (Hannah Aff.). Plaintiff was hired by FITCO to work in its sanitation department on February 13, 1995. (Keith Depo. at 31). Three weeks later, at plaintiff's request, FITCO transferred plaintiff to a new position, that of materials handler in its shipping and receiving department.[3] (Id. at 32-34).

Plaintiff's duties as a materials handler included unloading

---

[3] The shipping and receiving department is also referred to as the "traffic department."

5

"raw material," or chicken parts, from trucks that arrived at FITCO's plant. (Id. at 37-46). Plaintiff would inspect the interior of the truck for damage, contamination, and proper temperature, noting the quantity and quality of material received in company records. (Id.). He would then inspect the material for damage, contamination, and proper temperature, again recording the appropriate information in official company records. (Id.). After this inspection, plaintiff would place the received material in a large refrigerated storage area, where it would remain until needed by the plant. (Id.). Plaintiff's duties included inspecting the interior of the refrigerated storage area for contaminated, damaged, or leaking containers, and plaintiff was also required to check the storage area's temperature every two hours, recording his observations in a log. (Id.). FITCO used the records that plaintiff kept for inventory, shipping, and USDA compliance. (Pate Aff.).

After a two-week training period, plaintiff's supervisors (Lee Pate and "assistant team leader" Tony Saylor) began noticing mistakes and omissions in plaintiff's completion of the required paperwork. (Pate Aff.; Saylor Aff.). At first, Saylor and Pate did not discipline plaintiff for these errors, but simply informed him of the problems and showed plaintiff how to correct them. (Saylor Aff.).

In late March 1995, Lee Pate, the head of FITCO's shipping and receiving department, held a meeting of the department in

which he noted that too many paperwork errors were being committed, and that future errors or omissions would result in discipline. (Pate Aff.; Saylor Aff.). Following this announcement, on April 8, 1995, Saylor issued a "verbal corrective action form," indicating the plaintiff had made "numerous errors on paperwork" the previous day. (Saylor Aff., Ex. 3A). Specifically, on one shipment that arrived on April 7, plaintiff failed to note whether the packages were properly labeled and identified, as required by USDA regulations. (Saylor Aff., Ex. 3A-1; Keith Depo. at 121-26). On a separate shipment that arrived later the same day, plaintiff failed to record the weight of some raw material that was received. (Saylor Aff., Ex. 3A-2; Keith Depo. at 126-27).

On April 18, 1995, Saylor gave plaintiff an evaluation, which reflected satisfactory or better performance in all areas. (Saylor Aff., Ex. 3B). However, the form did note that plaintiff "needs to pay more attention to paperwork." (Id.).

On May 30, 1995, Lee Pate issued plaintiff another verbal corrective action form, which reflected that plaintiff had taken a 90-minute lunch without approval. (Pate Aff., Ex. 2A). The normal lunch period allowed was 30 minutes. (Pate Aff.).

On July 14, 1995, plaintiff was again reprimanded, this time by assistant team leader Colleen Nibblett. (Pate Aff., Ex. 2B). Nibblett issued a verbal corrective action form, noting that plaintiff had failed to record the temperature of the

7

refrigerated storage area at 1:00 and 3:00 p.m. on July 14, 1995. (Id.). The form also stated that "further negligence will result in further disciplinary actions." (Id.).

The next day, on July 15, 1995, Pate issued a "1st written corrective action" form to plaintiff. (Pate Aff., Ex. 2C). As on April 8, 1995, plaintiff had failed to record the weight of an incoming shipment of raw material. (Id., Ex. 2C-1). The written reprimand given to plaintiff recited that "if no improvement on paperwork continues, further corrective action will follow." (Id.).

On August 9, 1995, Saylor and Pate issues plaintiff a "final written corrective action" form, noting that plaintiff had failed to record the temperature of the refrigerated storage area. (Pate Aff., Ex. 2D, 2D-1). The form stated that "this is not the first time Tyre has been corrected on this same issue." (Id.).

Seven days later, on August 16, 1995, Saylor issued plaintiff a second "final written corrective action" form, which contained the following statement:

> Tyre has not done anything other than cleaning the cooler since 12:10 this afternoon.[4] I personally went in the cooler to see if there was any way to unload the truck that was on the door. There was 1 row of tubs taking up 3 rows that could have been moved for this load. There is an obvious lack of concern or initiative on Mr. Keith's part. When work gets slow he must be followed around and have something found for

---

[4]The reprimand was issued at 3:00 p.m.

him to do.

(Saylor Aff., Ex. 3C).

Although plaintiff had not disputed any of his prior reprimands, he did submit a handwritten response to Saylor's August 16 reprimand. The note denied any wrongdoing and argued, in the alternative, that if plaintiff had been guilty of inattention to his duties, that Saylor had failed to discipline white employees guilty of the same offense. (Saylor Aff., Ex. 3D). However, Saylor did not observe any other employees neglecting their duties on that day, see Saylor Aff., and plaintiff testified that he was unaware of any other employees who neglected their duties that day. (Keith Depo. at 155-56).[5]

In the two weeks that followed, plaintiff made several more errors in completing his paperwork. On August 17, plaintiff rejected two containers of raw material and noted "torn; exposed product" on one form, while indicating that the containers were in "good" condition on another form. (Pate Aff., Exs. 2E-1, 2E-3). On another shipment that arrived on the same day, plaintiff indicated that the inside of the truck was in "good" condition, but also indicated that it was damaged and dirty. (Id., Ex. 2E-2). On August 24, 1995, plaintiff recorded the receipt of 22

---

[5] In his deposition, plaintiff asserted that Saylor was not present on August 16 between noon and 3 p.m., and so could not have observed plaintiff loafing. (Keith Depo. at 153). Saylor's affidavit recites that, although he normally reported to work at 3:00 p.m., he arrived early on August 16 and personally observed plaintiff wasting time.

9

containers of raw material, although only 21 were actually received. (Pate Aff., Ex. 2E-4, 2E-5). In filling out the paperwork on an August 26, 1995 inspection of a truck, he failed to note the time of the inspection. (Id., Ex. 2E-6). On an August 28, 1995 inspection report, plaintiff again failed to note the time of the inspection and inconsistently stated that the truck was in "good" condition, but was damaged and dirty. (Id., Ex. 2E-8). On that same date, plaintiff failed to check and record the temperature of a container of received raw material. (Id., Ex. 2E-7). Finally, on August 29, 1995, plaintiff again failed to record the time of a truck inspection he performed. (Id., Ex. 2E-11).

Citing these "numerous paperwork errors," Pate suspended plaintiff on August 30, 1995, for consideration regarding whether to fire or retain him. (Id., Ex. 2E). Plaintiff was discharged on September 5, 1995. (Hannah Aff.). According to undisputed evidence in the record, Lee Pate and FITCO Human Resources Director Debbie Hannah are unaware of any FITCO employee who accumulated the number of disciplinary warnings plaintiff did in a comparable period of time and who were retained. (Hannah Aff., Pate Aff.).

Finally, the undisputed evidence in the record indicates that, between March 1, 1995 and September 5, 1995, only three other employees in FITCO's traffic department were disciplined: two received written reprimands, and one was fired; all three

10

were white. (Hannah Aff., Exs. 1H-1K). FITCO has also produced unrebutted evidence that, of the seven employees it discharged in 1995 for unsatisfactory job performance (including plaintiff), four were white and three were black. (Hannah Aff., Exs. 1A-1G). Finally, FITCO has introduced evidence that it disciplined thirteen white employees during 1995 for paperwork errors. (<u>Id.</u>, Exs. 1K-1DD).

## IV. Analysis

Under the <u>McDonnell-Douglas</u>/<u>Burdine</u> method for analyzing claims of discrimination, the first step is to determine whether the plaintiff has established a <u>prima facie</u> case. If the plaintiff succeeds in doing so, the defendant has the "exceedingly light" burden to produce some evidence that the challenged employment decision was the result of a legitimate, nondiscriminatory reason. If the employer meets this burden of production, the burden then shifts back to the plaintiff to convince the trier of fact that he suffered from intentional discrimination.[6]

Here, plaintiff does not dispute any of the violations of

---

[6]As noted above, plaintiff makes claims under both Title VII and 42 U.S.C. § 1981. However, when Title VII and § 1981 are used as parallel remedies for the same conduct, the claims are treated identically. See, e.g., <u>Vance v. Southern Bell Tel. & Tel. Co.</u>, 863 F.2d 1503, 1509 n.3 (11th Cir. 1989).

11

FITCO's policy he committed, and does not contest the numerous disciplinary warnings he received. Plaintiff's claim here is that FITCO discriminated against him by punishing him more harshly than white employees who committed similar offenses.

In order to make out a prima facie case of discrimination based on the differential application of disciplinary rules, a plaintiff must show (1) that he is a member of the protected class; (2) that he was qualified for the position; and (3) that similarly situated employees outside the protected group were treated differently from the plaintiff. See Nix v. WLCY Radio/Rahall Communication, 738 F.2d 1181, 1185 (11th Cir. 1984). Accord Lewis v. Zilog, Inc., 908 F. Supp. 931, 954 (N.D. Ga. 1995). In order to rely upon examples of "similarly situated" white employees, plaintiff must show that the white employees engaged in "nearly identical" misconduct, but were disciplined less harshly. See Nix, 738 F.2d at 1185-86; Lewis, 908 F. Supp. at 954. Accord McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 282 (1976) ("similarly situated" white employees are those guilty of violations of "comparable seriousness").

Here, it is undisputed that plaintiff is a member of the protected class, and the Court will assume (without deciding) that plaintiff was "qualified" for his position at FITCO. What remains is to examine plaintiff's proffer of evidence regarding white employees he claims were "similarly situated," but who were disciplined less harshly.

12

Plaintiff claims that two white employees, Tony Saylor and Bobby Isbell, were guilty of disciplinary violations for which they were not punished. Plaintiff claims that Saylor was involved in several unpunished misdeeds, as the following excerpts from plaintiff's deposition show:

> Q. Tell me how Tony was treated more favorably?
>
> A. Tony Saylor collects reptiles, snakes, lizards, that just sort of thing. He has left work during his shift to go buy a snake or pick up a snake. And to my knowledge, he wasn't disciplined about that.
>
> Q. Well, do you know if he was given permission to leave?
>
> * * *
>
> A. No, I'm not aware if he was given permission.
>
> Q. Okay. Anything else about Mr. Saylor?
>
> A. Tony Saylor ripped the rear doors off a tractor trailer belonging to Tyson Foods, and to my knowledge, he was never disciplined about that.
>
> Q. Do you have any indication that that was anything more than an accident?
>
> A. Yes.
>
> Q. What was it in your mind?
>
> A. How can you rip doors off a trailer?
>
> Q. Did you see it happen?
>
> A. No, I didn't see it happen.
>
> * * *

Q. You heard about it?

A. Yes.

* * *

Q. Okay. So you have reason to believe it wasn't an accident?

A. I have reason to believe it wasn't an accident.

Q. That he did it on purpose?

A. Let me rephrase that. Whether it was an accident -- it happened and he received no discipline about it.

Q. That's what you know?

A. Yeah.

Q. But you don't know whether it was an accident or not?

A. No, I don't.

Q. Anything else about Mr. Saylor?

A. Tony Saylor left a valve open on a tanker that held blood and sludge and that sort of thing, contaminated product. He left it open and blood -- the tanker was parked by the scales and blood just filled up all in the grass, out in the parking area, you know, just blood, and he received no discipline behind that. I had to clean it up myself with another employee.

(Keith Depo. at 97-103). Plaintiff also claims that Saylor's wife and daughter would come through the plant's rear entrance to bring Saylor his lunch, and would sit with Saylor on occasion and eat lunch with him. (Id. at 104). With regard to Bobby Isbell, plaintiff claims that Isbell brought his son to work "a couple of

14

times," and that Isbell surreptitiously listened to a portable stereo through headphones while working. (Id. at 104-05).

With regard to plaintiff's claim that Isbell was treated differently, the unrebutted evidence in the record indicates that Pate verbally informed Isbell that it was not permissible to bring children to work, and Isbell never did so again. (Pate Aff.). In addition, plaintiff has offered no evidence that tends to prove that Pate or Saylor knew that Isbell was wearing a portable stereo at work; Pate and Saylor's affidavits establish as a matter of undisputed fact that neither man was aware of this conduct. Absent some evidence that Saylor or Pate were aware of Isbell's misbehavior, plaintiff's claim that Isbell broke company rules cannot support an inference of discriminatory intent. See Jones v. Gerwens, 874 F.2d 1534, 1542 (11th Cir. 1989). So, plaintiff's claim must rise or fall on the differential treatment allegedly accorded Tony Saylor.

As noted above, plaintiff recites several incidents involving Saylor that went unpunished: (1) Saylor left work to buy a snake; (2) Saylor damaged a truck; (3) Saylor left a valve open on a sludge truck, creating a mess; and (4) Saylor's wife and daughter brought him lunch and sometimes ate with him.

Saylor's snake-buying excursion cannot support any inference of discrimination. Plaintiff testified that he did not know whether Saylor received permission to leave to pick up the snake. (Keith Depo. at 97). Moreover, the Pate Affidavit reflects that

15

Saylor was given permission to leave to pick up the snake. (Pate Aff.). Saylor did not commit any violation of company rules by leaving on one occasion to pick up a snake, and so the failure of Pate to discipline Saylor cannot support plaintiff's claim.

The incident in which Saylor damaged a truck also fails to support plaintiff's claim. Plaintiff testified that he did not witness the event in question, and did not know whether it was an accident or not. (Keith Depo. at 98). The undisputed evidence in the record is that Pate investigated the incident and determined that Saylor was not negligent or careless, and so Pate did not discipline him. (Pate Aff.). The undisputed evidence in the record also shows that plaintiff was involved in an accident that damaged a forklift and was not disciplined. (Id.). Saylor's truck accident could not support any inference of discrimination.

With regard to Saylor's creation of a mess by leaving open a valve on a sludge truck, the undisputed evidence in the record is that the proper filling of the sludge truck is a "guessing game," as it is difficult to tell when the truck is full. (Pate Aff.). Several team leaders have overfilled the truck and drained excess material out by leaving a valve open; FITCO has a system in place to clean up and account for waste drained in this manner. (Id.). Overfilling of the sludge truck was not a disciplinary offense. (Id.). Thus, Pate's failure to discipline Saylor cannot support plaintiff's claim that the disciplinary rules were applied

16

unequally.

Finally, plaintiff alleges that Saylor's wife and daughter brought him lunch at the plant, and sometimes stayed to eat lunch with him. Again, the undisputed evidence in the record is that non-employees, such as pizza delivery persons, regularly entered the plant to bring food to employees. (Pate Aff.). This was not a disciplinary offense. (Id.). In addition, the unrebutted evidence in the record is that Pate was unaware that Saylor's family members ate with him. (Id.). In addition, Pate's affidavit establishes as undisputed fact that it would be permissible for family members to eat lunch with an employee, so long as work was not disrupted. (Id.). Saylor violated no company policy in this regard, and so the lack of discipline could not allow the trier of fact to infer discrimination.

To summarize, the undisputed evidence in the record fails to raise any example of a FITCO employee who committed the number and type of disciplinary offenses that plaintiff committed. Plaintiff can point to no white employee who was treated differently by FITCO. And, beyond pointing out the lack of evidence to support plaintiff's claim, FITCO's unrebutted evidence establishes that it did discipline and terminate white employees guilty of paperwork errors similar to plaintiff's. This evidence affirmatively negates any possibility that FITCO terminated plaintiff's employment due to discrimination. FITCO's motion for summary judgment with regard to plaintiff's Title VII

17

and § 1981 claims is thus due to be granted.

With regard to plaintiff's Fifth and Fourteenth Amendment claims, the undisputed evidence in the record is that FITCO is a private company, not a governmental entity. (Hannah Aff.). Absent some state or federal governmental action, there can be no claim under the Fifth or Fourteenth Amendments. FITCO's motion for summary judgment is also due to be granted with respect to those claims.

A separate Order and Judgment in FITCO's favor will be entered.

DONE this 25th day of February, 1997.

_____
SENIOR UNITED STATES DISTRICT JUDGE